5-11-521 Simmons v. Shamrock Bank of Florida. Counselor, are you ready to proceed? Counsel, how are you doing? Good morning, Justice Palmer, Justice Welch, Justice to be named later. May it please the court, Mr. Levinson. David Antignoli, representing the defendant appellant, Shamrock Bank of Florida. This appeal involves some venerable concepts of real property law. Possibility of re-murder, the doctrine of merger, right of re-entry. But underneath that superficial arcanity is really one pretty simple issue. And that is whether the sellers in this transaction should accept the legal consequences of an agreement they entered into, an agreement which undid a real estate sale that had occurred three years earlier. This agreement entails some substantial benefits for the sellers. Number one, they ended up taking back property that had depreciated substantially in value. And number two, they received a general release from the buyer, avoiding numerous potential claims and litigation. Now, the effect of that transaction, if it is given effect, is to mean that the sellers also assumed risk. They assumed the risk that the buyer would default on a mortgage that the buyer had granted after the original sale and before the sellers and the buyer agreed to undo the transaction. The court below disregarded this agreement. And in so doing, committed reversible error. Let me back up and identify the parties more fully. The sellers are the plaintiffs in this case. They sold some property commonly known as the Olin Mansion in Alton to the buyer, an entity called Great River Enterprise, which is also a defendant in the case. After this sale occurred, the buyer granted a mortgage to my client, Shamrock Bank, to secure a loan, a loan which the buyer made in order to invest or improve the Olin Mansion. The loan was $1.3 million. The trial court found that Shamrock's mortgage was extinguished as a result of a possibility of reverter in the original conveyance from the sellers to the buyer. That conclusion is clearly erroneous in view of the fact that it ignores the second transaction. So let's just digress for a moment and let me try to explain how these two transactions, two key transactions occurred. The first one is the sale by the sellers to the buyer. That occurred in 2007. The consideration for this sale was some stock owned by the buyer. The buyer transferred this stock to the seller. It was valued at approximately $1.8 million at the time of the sale. The seller also retained a right of reversion. This right of reversion would come into play and enable the sellers to take the property back if the stock did not achieve a certain value within a period of five years. Was $6 million for that? Yes. The five-year period, however, was subject to being shortened. It could be shortened by a variety of events, including a sale of the property by the buyer, bankruptcy by the buyer, or if the buyer committed waste, a concept which was not defined in the agreement. After this original transaction, we go fast forward three years later to the second and final transaction, the one that should be the focal point of this case. The stage was this. A month before this agreement was entered into, the sellers claimed that the buyer had committed waste and thereby shortened this five-year deadline for the stock to appreciate in value. The stock clearly had not appreciated in value by this time, at least not to the $6 million figure. The seller threatened to sue to retake the property. Then the parties entered into a settlement agreement before any suit is filed. Pursuant to this settlement agreement, the sellers agreed to give the stock back to the buyer. The buyer agrees to give the sellers a warranty deed conveying title to the mansion back to the sellers. The buyer also agrees to release any claims against the sellers, including any claim he might have for unjust enrichment by reason of the improvements that he made to the property. In addition, the buyer agrees to indemnify the sellers against any liability in respect to the mortgage that had been granted to Shamrock Bank. The trial court essentially found that this second transaction was a nullity. It didn't even occur or need to occur because under the trial court's interpretation of these documents, the possibility of reverter came into play one month before this agreement was ever entered into, resulted in involuntary forfeiture of the buyer's title, and divested Shamrock of its mortgage at the same time. This conclusion rests on the premise that the original estate that was created in the buyer was a fee-symbol determinable. When I think of a fee-symbol determinable, I'm reminded of Cinderella's coach because they share the same defining characteristic. When the clock strikes midnight in the fairy tale, the coach turns into a pumpkin. It doesn't make any difference what the fairy godmother does, what Cinderella does. It's automatic, it's absolute, it happens at the stroke of midnight. The same is true for a fee-symbol determinable. The estate that is granted to the grantee evaporates automatically, involuntarily, by operation of law upon a specified event. In this case, the trial court said that that specified event was waste. That resulted in the divestiture of title without any further action by any of the parties. That conclusion is clearly wrong because the reversion of title is not automatic under the party's agreement. The reversion of title was expressly made subject to an option in favor of the sellers to keep the stock, notwithstanding the fact that it didn't achieve the stipulated value within the stipulated time frame. Let me give you a hypothetical as to why that option would have been important to the sellers in this case. Suppose that this stock had achieved a value of $5,999,000 on the deadline for the reversion period. Suppose that the sellers didn't want the property back if they had the choice of keeping this highly appreciated asset, the stock. Their agreement gave the sellers an absolute and irrevocable option to keep the stock. Because of this option, the estate that was granted to the buyer cannot be regarded as a fee-symbol determinable because it did not involve automatic termination. The sellers also have a fallback position here. They say, well, if it wasn't a fee-symbol determinable, then it was a fee-symbol subject to a condition subsequent with a right of reentry. We had a right of reentry. We exercised our right of reentry. And therefore, title was forfeited before we ever get to this second agreement. Well, that argument is fundamentally flawed because the sellers are unable to point to any action that they took to trigger the right of reentry. The case law recognizes only one means of exercise of a right of reentry under Illinois law, and that is filing a lawsuit, a lawsuit for possession, such as ejectment or forcible entry and detainer. But that never happened in this case. Instead, the sellers say, well, we threatened to file a lawsuit. A threat of lawsuit, though, is not the same as a lawsuit. We have cited in our brief the Powell v. Powell case, a Supreme Court case, which tells us how to exercise a right of reentry. In that case, the holder of the right of reentry actually sued for a declaratory judgment, some equitable remedy, says that the right of reentry has triggered giving my property back. It goes all the way up to the Illinois Supreme Court, and the Illinois Supreme Court says, we don't have jurisdiction. We don't regard a suit in equity as an exercise of a right of reentry. If you want to exercise a right of reentry, you need to file an action at law. Well, if you can go all the way to the Supreme Court with a lawsuit and still not have exercised a right of reentry because you didn't choose the right remedy, then by the stronger reason, a fortiori, a mere threat of suit does not cut it as an exercise of a right of reentry. So where does that leave us? That leaves us with the legal effect of the second transaction because this is the transaction whereby title actually went back from the buyers to the sellers. And that brings us to the question of the doctrine of merger. The doctrine of merger is pretty simple. If I have an estate or interest in real estate that is less than fee simple, such as a lease, a mortgage, or a reversion, and then I subsequently acquire the fee, those two interests merge together in the fee, and the lesser interest is extinguished. This is a textbook example of what happened in this case. We come to the second transaction in January of 2010 where the sellers want to take back this property. They have at that time a right of reversion. They agree to accept a deed conveying fee simple title. When that deed is delivered and voluntarily accepted by the sellers, the reversionary rights extinguished. They were merged into the fee simple title. And, of course, at that time, fee simple title is subject to a mortgage in favor of Shamrock Bank. Now, the doctrine of merger is not an automatic and inflexible occurrence or application. It is subject to being rebutted. If the party opposing application of merger can show that they didn't really intend a merger to occur at the time of the deed, or if the party opposing merger can show that it's inequitable to apply the doctrine, then the doctrine can be avoided. But the burden is on the party opposing merger to demonstrate that it did not exist, that it did not occur. In this case, that burden falls on the sellers, and they have fallen woefully short of the mark in overcoming the presumption of merger. First of all, in terms of intention, I invite the court to look at the merger clause in the party's second and final agreement. It says this agreement, the second and final agreement, supersedes all prior agreements. And, of course, one of those prior agreements was the agreement with the possibility of reversal. So the parties actually declared in the second and final agreement an intention that the right of reversion be extinguished. In addition, in the second agreement, the buyer agreed to indemnify the sellers against the mortgage. Now, if this mortgage had already evaporated and wasn't going to remain subject to title based on the doctrine of merger, this indemnification clause would have been entirely superfluous. The bottom line is that the sellers have not shown anything to rebut the intention pretty clearly expressed in this agreement, and by virtue of the deed, that merger would in fact occur. That brings us to the final question of the equities. This is the situation where the second agreement was entered into advisedly. The sellers had actual knowledge of the existence of the mortgage. The transaction was heavily lawyered between sophisticated parties, and the conveyance by warranty deed pursuant to the second agreement in full satisfaction was deliberate. So we have on one hand a knowing and voluntary deliberate attempt to effectuate a merger. And on the other hand, if merger is not applied, then the holder of this mortgage is going to be divested of a substantial amount of money, money that was actually invested into the improvement of the real estate. According to the P-Tax form that was filed when the second transaction occurred, the value of the mansion had appreciated by over $600,000 between the date of the original sale and the date of the second transaction. That windfall profit should have been used to pay back the mortgage. And if the doctrine of merger is not applied, we will reach the inequitable result that all the money invested from the proceeds of this mortgage to improve the property, all the benefit derived by the sellers when they took the property back, evaporates. In sum, Your Honors, the court below erred when it failed to take into account the legal consequences of the second transaction. As a result of the second transaction, the seller's right of reversion was extinguished, and title to this property remained subject to the mortgage. This is a case where all of the underlying facts are undisputed by both parties. And these facts lead inexorably to the result that title to the Olin mansion remains subject to an unreleased and an unpaid mortgage. For that reason, Shamrock asks that the court reverse the summary judgment in favor of the sellers and order that summary judgment be granted on Shamrock's motion for summary judgment. Thank you, Your Honors. May it please the court. Counsel, Barry Levenstam appearing on behalf of Mr. and Mrs. Simmons this morning. And we will be requesting this court to affirm the summary judgment that Mr. and Mrs. Simmons received based on the circuit court's excellent and detailed opinion, which very carefully addresses every issue in this case, including, I might add, specifically the text of the agreement regarding reversion, which is the second of the agreements counsel was referring to. And if you look at the last two or three pages, the court goes through that agreement on its face, addresses the paragraph 11 merger clause, and does so quite correctly by pointing out that the agreement regarding reversion specifically incorporates in recital and in the operative provisions. The very sale agreement that Shamrock Bank urges this court to find was superseded by that second agreement. So the circuit court got that right. And, indeed, the circuit court's opinion reaches the same exact conclusion that Shamrock Bank itself reached when it sent a letter asserting its claim against First American Title Insurance. And we can't lose sight of First American Title Insurance because that's the company that caused this litigation in the first place by missing the properly reported deed that Mr. and Mrs. Simmons filed to protect their possibility of reverter and preserving it. And, apparently, First American Title will not pay that claim until it pushes all of us through this expensive and time-consuming litigation. I note that they start at the back instead of at the front. And any time you take things out of context, chronologically or otherwise, you're likely to get confused. And so I'm going to start with the very beginning of this transaction. And although it may be a little arcane and a little dull, people's homes and properties turn on this sort of thing, and terms of art are used advisedly. This was a textbook creation of the possibility of reverter, a fee-simple, determinable possibility of reverter. And I say that because the Simons and Smith textbook on the law of future interest says specifically that you don't need to use special words. It's only necessary that the language demonstrate the intention of the conveyor, that the estate of fee-simple shall terminate automatically upon the occurrence or non-occurrence of the stated event. If you look at the sales agreement, paragraph 3.1, automatically is the exact word that it uses in saying the reversion date will be accelerated automatically upon the occurrence of an event of bankruptcy or the purchaser's waste of the property, which the agreement carefully defines. It does not, as Shamrod Plank asserts, does not leave that term undefined. It says abuse, destructive use, neglect are all acts of waste. The other reason that we need to proceed from this beginning point is because you don't ever even get to the question of merger unless the transaction was voluntary in the first instance. And if you want to talk about Cinderella and fairy tales, that's what we're talking about here, the notion that this was a voluntary transaction. Mr. Tolman relinquished his ownership of a very valuable piece of property, which he easily could have sold for more than the value of the mortgage and paid off the mortgage, instead accepting back what amounts to virtually worthless stock. And as a result, incurred personal liability to the bank for the amount of the mortgage. So if you think that was a voluntary transaction, I respectfully suggest that Shamrod is in the fairy tale. And also, at the same time, Mr. and Mrs. Simmons devised this transaction to give themselves the possibility of reverter to protect themselves against the eventuality that the stock turned out to be worthless. And you'd have to indulge in fairy tales again to believe that they voluntarily, in taking back that property and exercising their rights under the agreement, said, oh, and by the way, we'll be happy to look after Shamrod Bank's $1.3 million mortgage, which nobody told us about before him. Nobody told us about it until it was too late. So no, this was a classic fee simple determinable with the possibility of reverter. There are examples of this in the case law. This court in Marinholtz found the existence of a fee simple determinable with the possibility of reverter. The mortgage was recorded subsequent to our transaction. Right. But at a point in time when there was nothing that we could do about it, we weren't told about it in advance. Before it was entered into, before it was recorded. We found out about it in the context of the mechanics latency, because there's no reason for us to be checking the deed of recorder every day like there was for them when they went to give the mortgage. So they have tried to discount the fee simple determinable based on the action. But if you read the action, it confirms the determinable nature of the possibility of reverter, because it is in context saying this must happen before the reversion takes place because it is automatic. The reversion is automatic. It must be exercised in writing so that it is perfectly clear if there is going to be an option exercise that it is made plain on the record. There is, had this been a condition subsequent, you don't need a written waiver. You can simply not exercise the right of reentry. So the fact that there is a written option written into this agreement makes it perfectly clear that this was a determinable fee. And the other thing I would note about the structure of the option is also carefully crafted. The option appears in the middle of 3.1 saying notwithstanding the foregoing, the acceleration provision follows the option. It is not the foregoing so that the acceleration provision happens and it is not subject to the option. Once there is an acceleration, once the reversion has occurred, the transfer is automatic and there is no longer the opportunity for this option. Now, there is no dispute on the record. Chamberbank has never disputed that waste occurred. What they have argued is, well, you should have told us about the waste so that we could have come in and fixed it and then preserved our mortgage and you wouldn't have had your reversion. Well, they never cite any basis for having a right to do that. The waste provision is specifically between Mr. Tomer and the Simmons family. And if you look at paragraph 22 of the sale agreement, you will see that it says there are no third party beneficiaries here. This is solely for the benefit of the parties to this agreement and no other party has any rights here. So the bank had no right to proceed. Now, should this be considered the alternative, the fee simple subject to a condition subsequent? There is no question but that Mr. and Mrs. Simmons prevailed because there is no question but that they exercised the right of reentry. They took the property back. Shamrock Bank argues that Powell says you have to file a lawsuit, an ejection action, in order to effectuate the right of reentry. If you read Powell, it is expressly not what Powell says. What Powell says is when you have a condition subsequent, notwithstanding the breach, the estate abides in the grantee until it is defeated and determined at the election of the grantor, this election may be signified by a reentry or some act equivalent thereto. There is nothing in Powell that requires that any sort of lawsuit be filed. You can go back on the property and say, hey buddy, get out of here. This is mine now. This has occurred and if they agree, why would you require there to be a lawsuit? What Powell turns on in terms of the conclusion where it says we're remanded with directions to dismiss the bill for want of jurisdiction is because there was, having gone to the equity court in those days, and Powell takes place I believe in the 1920s, the equity court did not have jurisdiction to address the problem that they wanted. And that's exactly what it says. Remanded with directions to dismiss the bill, which was of course the old word for the complaint under the equity courts, for want of jurisdiction. In 1964, the Illinois General Assembly abolished the distinction between courts of law and courts of equity. And then in 1970, with the new constitution, the unitary court system was permanently enshrined. And the jurisdictional aspect went out the window. But the point is, if you had gone to federal court and litigated a state action without diversity, for instance, at the end of the day when you got up to the Seventh Circuit and you looked up and saw Judge Posner sitting there instead of your honors, he said, no jurisdiction, it doesn't matter whether you're right or wrong, the court lacked the power to act. And that's all Powell was saying about why they had elected the wrong remedy. That's gone. That no longer exists. But the fact is what Powell says about how you reenter is that you just reenter the property by walking back on it or some equivalent thereto or by filing a lawsuit if necessary. Here, it proved not to be necessary. Mr. and Mrs. Simmons discovered that the house was at great risk. The boilers weren't working. Subzero weather was coming on. He got into a dispute with Mr. Tomer about who owned what. He became counsel. Counsel prepared a complaint. Counsel appended to the complaint the affidavit of the boiler repairman stating in late December these were the problems with the house. And then he sent it to him. And, you know, the thought was save all this litigation if they agreed and they did. So there was no need to effectuate this right of reentry to actually file a lawsuit. And the parties got together like sophisticated parties are supposed to do, and they put together a reversion agreement. And if you read that reversion agreement, what it says is based on the sale agreement, there is this right of reverter, this possibility of reverter. And we're going to effectuate that now. And they set forth in the recitals the fact that there was waste. The parties had acknowledged there was waste. And so we're going to effectuate. So you don't – the law is perfectly clear. You don't even get to the merger issue if the transaction is not voluntary. As I've said before, there is no way in the real world that Mr. Tomer was giving this up and leaving himself exposed to $1.3 million of personal liability when he had this house if it was voluntary. There is no way on the other side of this transaction that Mr. Simmons is going to voluntarily incur a mortgage that was entered, remember, on a defeasible estate, not on a feasible, because the title insurance company blew the search. That's what you have title insurance for, frankly, if you want to talk about equities here. They have a personal judgment against Mr. Tomer who borrowed the money. And they have a claim against the title insurance policy that blew the title. So if you're talking about equities, the fact that the market value may have gone up over five years for this nice home is not necessarily a reflection of the investment. It may be a reflection of market conditions. There's no evidence that it reflected the investment. Part of that money was used to tear down an historic greenhouse and to build what can be loosely referred to as the garage mahal, a 20-car garage. Well, you know, that may not be – Mr. Simmons never did that when he lived there. That may not be adding value. And in any event, you don't take a $600 uptick in the market and say, now I get a $1.3 million mortgage. That's not the equities. The equities here are – and let me pause for just a second to interject that intent is key to the doctrine of merger. You have to intend merger to occur in order for the doctrine to work. And clearly there was no intent here. And now the list that I'm going to go down applies both to the equities, what we did right, and to the intent, because it reflects that the Simmonses never intended to end up with a mortgage on this property when it reverted. First of all, they took the time to record the deed properly with the reversion of evidence. Mr. Tomer, the other party to the transaction, went into the bank and said, hey, I got to warn you. There's this reverter. And the bank said, all right, no problem. Don't worry about it. We – you know, there's nothing for you to worry about. When the mechanics lien case came up, Mr. and Mrs. Simmons sought leave to intervene. They got leave to intervene, and they pursued their rights as far as they knew they could pursue them. By that time, Meridian, the bank with which Shamrock did business and Mr. Tomer did business, but my clients did not, had been shut down by the FDIC, so they brought the FDIC and served them. And they got a decree from the judge that their reverter was primary. Then, when back taxes that Mr. Tomer didn't pay threatened to put the house up for tax sale, they came in and they paid those to protect their reverter. They paid the assessments to protect their reverter. They fixed the boiler to protect the property on their reverter. All these things are both indications of their intent to protect their reverter, not to let it go, just like hiring a lawyer, sending a letter with a complaint and a supporting evidentiary affidavit. That's all to protect the reverter. The notion that having done all that, they would voluntarily and intentionally forego the reverter and let it disappear and take a somehow voluntary transaction, I suggest, is the Cinderella and the fairy tale. So, I believe that the judge got this all right. Metropolitan Life, which is the case they cite on the question of merger, talks about the importance of intent to the merger, and this abuses anyone who reads it of the notion that the doctrine of merger exists to protect third parties, like the mortgage holder here. In MetLife itself, the mortgage holder lost. The mortgage holder said, we don't want there to be a merger because that makes the leasehold payments that we were looking to as our security here disappear. What had happened, W.T. Grant, a realty company, had acquired the underlying property that W.T. Grant, the main company, the main corporation, had leased. And they transferred the two together and said, we intend for merger to occur. The lease disappeared because of the intent to merge. And MetLife was left without recourse to the leases, which the lease payments, because they disappeared. So, merger is not a doctrine that exists to protect people. It's a doctrine that hinges on intent and that exists to simplify title when the parties intend that that happens. And here, the parties did not intend, as I've gone through in some ways, for that to happen. So, I think I've pretty much covered everything that I would like to cover. If you have any questions, I'd be happy to answer them. Otherwise, we ask you to affirm again the excellent opinion below for the reasons set forth. Any questions? Thank you. Mr. Levinson has taken the word automatic out of the sales agreement, completely out of context. The word automatic modifies when the reversion date occurs. If there is one of these triggering events to shorten the reversion period, then the reversion date automatically accelerates. But that has nothing to do with whether title remains in the buyer, notwithstanding acceleration of the date. Under the clear terms of the agreement, title remains vested in the buyer, notwithstanding occurrence of this reversion date, because otherwise, the seller's option to keep the stock would be meaningless. Again, my hypothetical, it's 11.59 p.m. on the day of the reversion date. The stock is very valuable at that time. The sellers want to keep the stock. They don't want this reversion to occur. Well, they have the right to let the reversion date come and go and then say we opt to keep the stock and let you keep the title. So this is in no sense an automatic reversion of title when that reversion date occurs. Instead, that's what triggers the seller's option to decide whether or not to keep the stock or take the property back. And that's exactly what occurred here, Your Honors. If you look at this so-called reversion agreement that they entered into, you can't explain it based on their theory that title had already been divested or involuntarily forfeited when this waste occurred. Remember, the so-called waste occurred in December of 2009, yet the party one month later entered into an agreement that says the reversion date has not occurred. The reversion date will not occur until the deed is delivered from the buyer to the sellers. In short, there was no involuntary forfeiture of title. The reentry issue, if in fact you could just walk out on the property and say, I have reentered and your title is gone, then I don't know why the Simmons or the sellers would have even threatened to file a lawsuit because under their theory, all they had to do was think about wanting this property back, and that was sufficient to automatically divest the buyer of title. Obviously, that's not what occurred because they entered into an agreement that structured how, when, and the terms under which title would be reconveyed from the buyer to the sellers. And that brings me to the question of intention because we know there was not an involuntary forfeiture. We know from the party's conduct in executing these deeds and this settlement agreement that it was a voluntary conveyance in lieu of an involuntary forfeiture. And why would the sellers do this? Well, first of all, they didn't assume any personal liability on the mortgage debt. Although the mortgage remained outstanding, the personal liability remained with the buyer. What the sellers did is that they assumed the risk through an indemnity clause that the buyer would, in fact, discharge the mortgage liability. Why did they do this? Because this reversion settlement agreement offered several significant advantages to them. Number one, they get to advance the so-called reversion date by three years. Remember, we're in the second year of a five-year contract here. By short-circuiting this and getting the buyer to agree, well, some waste event has occurred, they get the property back three years sooner than otherwise. And remember, the buyer has substantially improved this property. He has a claim for unjust enrichment. The seller is getting general release of that claim. This is a situation where they consciously assume the risk of liability on this, that the property would remain subject to the mortgage in exchange for these concessions from the buyer, the indemnity agreement, the release, the advancement of the reconveyance of title. Thank you, Your Honors. This will be taken under advisement and an opinion in due course.